LULIE WELLS SMITH *v.* FIRST NATIONAL BANK
OF SOUTHERN MARYLAND

[No. 94, October Term, 1937.]

*Decided January 13th, 1938.*

482

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, SHEHAN, and JOHNSON, JJ.

*John B. Gray, Jr.,* for the appellant.

*T. Van Clagett, Jr.,* and *Marshall H. Lynn,* for the appellee.

JOHNSON, J., delivered the opinion of the Court.

This is an appeal from the Circuit Court for Calvert County, in equity. The contest is between two creditors of C. A. M. Wells, and concerns the distribution of certain funds in the hands of T. Van Clagett, assignee of a mortgage for the purpose of foreclosure. The mortgage in question was executed March 4th, 1933, by Wells and wife to the Maryland Real Estate Title Company, to secure a series of notes totaling $20,000, bearing interest at the rate of six per cent. For many years prior to its execution, Mr. Wells was a respected citizen of Calvert County. He was president of the appellee institution, highly regarded as a business man, interested in many business lines, and well regarded financially. However, as a result of the depression, his reputed wealth shrank practically to the vanishing point, and his liabilities, direct and indirect, to appellee were in excess of $26,000. Certain of those obligations had originally been secured by collateral which, in the opinion of the bank directors, had become worthless, and Wells was urged to pay those or give additional security, especially for certain items. The situation became so acute that Wells, who was no longer conducting any business in that section, being then stationed at Winston-Salem, North

Carolina, as an employee of some department of the federal government, returned to Maryland and conferred with the bank directors on or about March 1st, 1933, in an effort to get his affairs adjusted. Many, if not all of them, got the understanding that he agreed to execute a mortgage for $20,000 to the bank upon a tract of land containing 76¾ acres, known as the Battle Creek property, located in Calvert County, to better secure his indebtedness to the bank. Wells, however, emphatically denied having made such an agreement, but stated that his proposition was to execute the mortgage upon condition that the bank would make available to him certain funds, and his contention is to some extent corroborated by William S. Hill, cashier and vice-president of the bank.

In pursuance of this understanding on the part of the directors, a mortgage was prepared and delivered to Mr. Wells for execution by himself and wife. On the following Monday this mortgage had not been received, and the directors decided to obtain confessed judgments upon Wells' overdue obligations. They accordingly, on March 6th, 1933, took certain notes to Prince Frederick, and at noon on that day obtained two confessed judgments upon them (1) against Wells and one Kicklighter for $229.50; (2) against Wells and wife for $3,517.50. Four days later the bank obtained another judgment against Wells and one Chesterman for $377.40 and costs. After filing the first two confessed judgments, and before leaving the clerk's office, the representatives of the bank were informed by the clerk of the Circuit Court that he had received from Mr. Wells for record a $20,000 mortgage in favor of the Maryland Real Estate Title Company, but since at that time the bank holiday was in effect, Wells' check for recording fees, which accompanied the mortgage, could not be used, whereupon the bank officials advanced the recording fees. They state that this was done because they felt that, notwithstanding the mortgage was not given to appellee, but to a corporation of which Wells was in control, it might be his plan to have

the mortgage assigned to their bank and protect them in accordance with their previous understanding; in other words, that they regarded the title company merely as a "conduit" for the perfection of Wells' plans. However, the bank held other obligations of Wells which were not satisfactory, and they continued to press him for their settlement until early in April following, when Mrs. Wells, accompanied by a Mr. Welsh, the friend of her husband, went to the bank and delivered to it notes in the amount of $6,500, which were secured by the $20,000 mortgage, receiving in exchange certain obligations of Wells. The bank also took by way of assignment from the title company an assignment of the mortgage to the extent of $6,500 of the indebtedness secured thereby, and interest thereon. Later, on May 4th, 1936, this interest was assigned by the bank to T. Van Clagett for foreclosure.

The entire property conveyed by the mortgage was sold under foreclosure proceedings (Code, art. 66, sec. 6), and the bank became the purchaser at the sum of $12,100. This sale was finally ratified on July 1st, 1936. Before the proceedings were referred to the auditor, the present appellant, a sister of C. A. M. Wells, filed her petition in the chancery court, alleging the execution by Wells and wife of the mortgage in question, the assignment to the bank of a 65/200 interest therein, and the subsequent sale of the property; further, that on March 4th, 1933, the original mortgagee had for value received indorsed to the petitioner the remainder of said mortgage notes, amounting to 135/200 of the mortgage and the debt thereby secured, with interest to accrue thereon, but through inadvertence the actual legal title to that part of the mortgage was not assigned unto her until October, 1936. The record shows this assignment to have been made to the petitioner on October 10th of that year, and that the notes covering the 135/200 interest in the mortgage were filed in the proceedings three days later, and that they then bore the indorsement of the mortgagee, Maryland Real Estate Title Company. The

petitioner further alleged that no part of the accrued interest on that portion of the mortgage belonging to her had been paid; that she was entitled to be paid, out of the proceeds of the sale of the real estate after the payment of costs incident thereto, a proportionate share thereof, and accordingly prayed the allowance of said claim. This petition was by the chancellor, together with the other proceedings in the cause, referred to the auditor with instructions to state such an account or accounts as might be right and proper in the premises. The bank filed with the auditor an answer to the petition, claiming priority out of the payment of the residue of the funds resulting from foreclosure by virtue of its judgments, alleged further that Wells had agreed to execute to the bank the $20,000 mortgage and had failed to do so, and stated that the obligations for which the 65/200 mortgage interest had been exchanged were also obligations of the title company, and that it was understood and agreed by "all the parties to the mortgage" that the individual indebtedness of Mr. and Mrs. Wells, also those of Wells upon the Kicklighter note, all represented by its judgments, were to be taken care of as a prior claim in any sale for foreclosure of the mortgage; that it had on October 1st, 1936, caused attachments to be issued upon its judgments, one of which was laid in the hands of the assignee of said mortgage as garnishee; the other having been issued for the purpose of seizing all the capital stock owned by Wells and wife in the title company. It denied Mrs. Smith's ownership of the residue of the mortgage indebtedness as claimed in the petition, and denied she was the *bona fide* owner as assignee of said mortgage and mortgage notes as claimed in her petition.

Testimony was taken before the auditor, at the conclusion of which he stated and returned to the court accounts A, B, and C. No dispute arises as to account A, which, after allowing expenses incident to foreclosure, left a net balance for distribution of $10,733.66. It is with the distributable balance that accounts B and C deal. Account B distributes to the bank 65/200 thereof, amount-

ing to $3,179.56, and to Mrs. Smith 135/200, amounting to $7,554.10. Account C distributes to the bank the sum of $6,545.39 in full payment of its mortgage debt, as shown by statement filed in the proceedings, and the further sum of $3,001.70 to the bank in payment of the judgment held by it against Wells and Kicklighter, and the balance of $3,883.57 is likewise distributed to the bank as a credit upon the judgment held by it against Wells and wife. Exceptions were filed by Mrs. Smith to account C, while the bank filed similar exceptions to account B. Further testimony was taken before the chancellor at the hearing on exceptions, and this, together with that taken before the auditor, is included in the record. Much of this has heretofore been alluded to. Without delivering any opinion showing his findings of fact and conclusions as to the law, the chancellor ratified account C, and it is from that order that the present appeal is taken.

From what has already been said it is manifest that the claim of Mrs. Smith must depend upon whether she has satisfactorily established her title to the notes in question, for while there is no dispute that the title company, to whom the mortgage was first given, was not the creditor of the mortgagors, we are of the opinion that it must be regarded in equity as a trustee. Moreover, if her title to the 135/200 interest in the debt secured by the mortgage is established, no good reason appears for holding that her claim is in any sense inferior to that of the appellee, for its 65/200 interest in the mortgage debt.

A careful consideration of the record has convinced us that, on the date of the execution of the mortgage, Mr. Wells was heavily indebted to his sister, Mrs. Smith. This indebtedness arose in two ways: (1) From the fact that he and his wife had previously, to secure a loan due her of $6,500, executed a mortgage for that amount in her favor against a part of the property subsequently conveyed by the $20,000 mortgage, which had later been reduced to $6,000. It is true that this mortgage had not been placed upon record, due to the fact that Mrs. Smith left such matters to her brother's attention, yet this fact

in no way extinguished that obligation. (2) That under the terms of their father's last will and testament he and his brother were nominated as trustees to receive a considerable sum of money, estimated at $14,000, and invest the same and pay unto the sister interest thereon during the term of her natural life; the corpus upon her death to go to her son. The trustees thus named defaulted, and the securities and funds with which they were chargeable were used by C. A. M. Wells as his individual assets, with the result that, like his other property, they were lost and dissipated. In that situation he agreed to pay her $900 annually during her life; this being the amount agreed upon as the normal and proper income for her to receive from said funds, had they been safely invested. As a result of his financial situation, payments upon this had materially decreased, and while he attempted to secure her in such payments by an agreement from a cemetery company which had acquired his interest in certain property, we are by no means satisfied that this afforded the sister any adequate security for the payment of the income in question. Mr. Wells testified that he executed the mortgage for the protection of his sister to whom he was thus indebted; that he delivered the notes to his wife to turn over to the sister; and this is corroborated by Mrs. Wells. The sister also states that all of them were delivered to her and bore the indorsement of the title company; that they remained in her possession in her apartment until the bank officials began to press her brother for settlement of certain obligations totaling around $6,500, and he then persuaded her to turn over to him notes totaling that amount, giving her in lieu thereof the note of himself and wife for $6,500. This is corroborated by Mr. and Mrs. Wells, the latter of whom took the securities to the bank and secured possession of her husband's overdue liabilities.

Counsel for the bank, in oral argument before this court, stated that undoubtedly Wells owed Mrs. Smith, but contended that the assignment had not in fact been made at or about the time of the execution of the notes, citing as a reason Wells' agreement, as understood by

them, to execute the $20,000 mortgage to the bank, but even though the bank officials were in this respect falsely misled, this cannot defeat the transfer to the sister, since, aside from a statute of bankruptcy or insolvency, a debtor has a right to transfer in good faith and for a fair consideration, even though it consists of an antecedent indebtedness, all or part of his property to one creditor, although he is insolvent and such transfer hinders or delays his creditors. *Drury v. State Capital Bank,* 163 Md. 84, 161 A. 176; *Wareheim v. Bayliss,* 149 Md. 103, 131 A. 27; *Thompson v. Williams,* 100 Md. 195, 60 A. 26.

If in this case the selling price of the property is to be taken as any criterion of its value, it would seem clear that Wells' $6,000 indebtedness to his sister constituted a fair consideration for the assignment of the notes, apart from his other obligations to her which arose from his dealings concerning his father's estate.

They further cite as reasons why assignment of the notes was not made as alleged: (1) The fact that neither Wells nor Mrs. Smith, from the time of the execution of the mortgage until the filing of the petition by appellant, mentioned the transfer to them; (2) that a Mr. Clark, who had attended the sale and bid upon the property, then had such notes in his possession; and (3) that Wells had, shortly after executing the mortgage, written the bank cashier from Winston-Salem, N. C., promising to have his wife deliver to the bank the "form notes." Undoubtedly, these circumstances were calculated to raise suspicion in the minds of the bank directors as to the *bona fides* of the assignment, but it must be remembered that throughout the period Wells was being hard pressed by his creditors for settlement of his obligations, and, even if we assume that the "form notes" mentioned in his letter referred to the notes in question, this of itself, had they already been assigned to his sister for value, could not defeat her rights. Furthermore, it does not appear that Mrs. Smith at any time made any statement which could be construed as inconsistent with the fact that she held the obligations in this manner. Her

rights were determinable by the fact that she received the assigned notes for a valuable consideration and could not be lost by her failure to inform the bank officials of this fact. So far as Mr. Clark's having the notes in his possession is concerned, there is no dispute as to that fact, but from the evidence before us we are of the opinion that he possessed them as Mrs. Smith's agent and attempted in every way possible to use them for her benefit, first, in preventing the foreclosure sale, secondly, in protecting her by purchasing the property at the sale.

We are furthermore of the opinion that, under the circumstances of this case, the fact that Mrs. Wells originally received only the assigned notes, without having the 135/200 interest in the mortgage assigned to her until a much later date, is not a circumstance that would defeat her right to assert her claim to 135/200 of the distributable surplus, since in a court of equity such an equitable assignment would be recognized and enforced. *Jones on Mortgages* (7th Ed.) secs. 818, 819-821, 822; *Frederick County Nat. Bank v. Schlosser,* 152 Md. 609, 137 A. 351; *Pen Mar Co. v. Ashman,* 152 Md. 273, 136 A. 640, and authorities there cited; *Bogert on Trusts and Trustees,* vol. 1, sec. 24, page 122.

Since it is our conclusion that appellee has failed to establish actual or constructive fraud in Mrs. Smith's acquisition of the 135/200 interest in the mortgage debt, there being no contention raised as to the validity of the 65/200 interest, it must also be held that the judgments held by appellee against Wells are junior to this prior, specific, lien of the $20,000 mortgage. *Dyson v. Simmons,* 48 Md. 207; *Hartsock v. Russell,* 52 Md. 619.

It follows that the decree appealed from must be reversed, and cause remanded for decree not inconsistent with the views expressed herein.

> *Decree reversed and cause remanded for
> further proceedings in accordance with
> this opinion, with costs to appellant.*